UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ARTHUR D'ANTONIO,                               **MEMORANDUM & ORDER**
                        Plaintiff,

        -against-                                Civil Action No. 14-2697

PETRO, INC.,
                        Defendant.
---------------------------------------------------------X

**APPEARANCES:**

**For Plaintiffs:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
By:     Jose G. Santiago, Esq.

**For Defendant:**
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
By:     John M. Simon, Esq.

Fox Rothschild
100 Park Avenue, Suite 1500
New York, NY 10017
By:     James L. Lemonedes, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff Arthur D'Antonio ("Plaintiff" or "D'Antonio") commenced this action against

his former employer, defendant Petro, Inc. ("Defendant" or "Petro") asserting claims under the

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"), the Age

Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"), the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA") and the New York State Human

Rights Law, N.Y. Exec. Law § 296 *et seq.* (the "NYSHRL").  Presently before the Court is

Defendant's motion for summary judgment. For the reasons set forth below, the motion is

granted.

## BACKGROUND

The following facts are taken from Defendant's Rule 56.1 Statement and Plaintiff's Rule 56.1 Counterstatement, unless otherwise indicated, and are undisputed unless otherwise noted.

Petro, a retail distributor of home heating oil, maintains an Information Technology ("IT") Department that employs approximately 20 individuals. It hired D'Antonio in 1993 as a night operator in the IT Department's Operations Group. The Operations Group is generally responsible for executing software programs that transfer data files related to Petro's customer billing statements, dunning letters, bank statements, and the like.

In 2003 D'Antonio was promoted to the position of Supervisor of Computer Operations, a position he held until his layoff on April 9, 2013. At all relevant times, D'Antonio was directly supervised by Peter Paprota ("Paprota"), Manager of System Engineering and Computer Operations.[1] Paprota was in turn supervised by Brian Boschert ("Boschert"), Director of IT.

As Supervisor of Computer Operations, D'Antonio was mainly responsible for generally administering Operations' responsibilities and supervising Operations Analysts. In the years leading up to his 2013 layoff, D'Antonio supervised two Operations Analysts, Mike Ledesma ("Ledesma") and Joe Bach ("Bach"). As Operations Analysts, Bach and Ledesma were directly responsible for running software systems and procedures to generate reports or other results. Defendant describes the duties of Bach and Ledesma as similar but, given that they worked at different times of day, one was more familiar with tasks that needed to be completed in the morning, while the other was familiar with tasks to be completed in the evening. Plaintiff

---

[1] In 2012 prior to the elimination of plaintiff's position, Paprota supervised D'Antonio, Joe Bach and Mike Ledesma. Ex. C to Simon Aff. at 11.

describes their duties as different with Bach responsible for back-up tapes and Ledesma responsible for creating statements and delivery invoices for customers. As their supervisor, D'Antonio made sure Bach and Ledesma completed their duties and he was the first line of support if they experienced problems or were unavailable to perform their duties. D'Antonio maintains that his responsibilities also included putting together new procedures, managing bank tapes, and managing Pegasus and Raven (software programs used by Petro).

In 2010 or 2011, Chris DiMattio, the Vice President of Finance and Boschert's supervisor, directed Boschert to reduce IT expenditures and, if possible, trim staff. In response, Boschert reviewed various IT positions, ultimately eliminating the position of Dion Xavier, Networking Supervisor, reducing one position of Security Manager and one position of Administrator from full-time to part-time, and not filling an open help desk position. None of these individuals belonged to the Operations Group or were supervised by Paprota. D'Antonio states of Petro: "They were always reviewing staffing . . . .[I]t was constant. I heard people talking about it, they were always switching from one department to other [sic] department . . . . [T]he security manager didn't have a full-time job so they made him part time."

On February 1, 2012, D'Antonio had a heart attack. He took three or four weeks of medical leave from work after his heart attack, returning to work in March 2012. In early April, 2102, D'Antonio had an anxiety attack, resulting in his taking approximately six weeks medical leave for his condition, diagnosed as stress, anxiety and depression, returning to work in May 2012. Between 2008 and January 2016, at least three (3) employees in Petro' s IT Department have taken medical leave from work under the FMLA. Two of those three continue to be employed by Petro (the third is the Plaintiff, Arthur D'Antonio). Of those two, one employee has

been promoted since taking medical leave and the other employee is Paprota.

Following his return from medical leave in May 2012 D'Antonio claims Paprota and Boschert treated him differently. He testified that Paprota:

> used to say good morning. Didn't say good morning anymore. When he walked by my office he either looked up in the air, down at the floor or in the other direction . . . . Any minor little incident became a major incident. He would pace back and forth by my office for 20 minutes with his hands behind his back, head up at the ceiling and ramble on about something that was of no consequence . . . .Basically just never talked to me. Didn't even discuss work for the most part, occasionally something would come up, but it was like total separation . . . . He used to talk about the job, what was going on, issues with other workers. He stopped doing that.

Ex. A to Simon Aff. (D' Antonio Tr.) at 115-17. He further testified that he received the same treatment from Boschert. Although his "contact with [Boschert] is not on the level it was with [Paprota], but there was zero, not even good morning anymore." *Id*. at 175. Plaintiff admits that Boschert did not make any comments to him about his disability, but asserts that Paprota on more than one occasion asked him "if [he] was comfortable doing [his] job, if [he] could still do [his] job." *Id*. at 176.

D'Antonio alleges that in March 2012, upon his return from his first medical leave for his heart attack, Paprota asked whether he was thinking about retiring. *Id*. at 160-61. Paprota mentioned retirement a second time, in July 2012, after D'Antonio had (in May) returned from his second leave for anxiety. Each time D'Antonio responded that he was not considering retiring, the matter was immediately dropped: "There was no persistence." *Id*.

In the time period between his return from medical leave in May 2012 and his layoff in April 2013, D'Antonio describes eight interactions with Paprota as follows:

1. On July 18, 2012, after D'Antonio disagreed with Paprota about a project Paprota had assigned him months before (which project Plaintiff asserts would have violated a company policy and have likely resulted in the termination of the entire Operations Group), D' Antonio claims that Paprota "came flying in [to my office] completely out of control, smashed into the door, smashed his hands on my desk, jumped at my face that forced me to move back in my chair, and he said Who the f--- do you think you are? And he kept moving his face at me forcing me further and further back. Completely out of control. I mean, his face, his eyes, he was like a raging lunatic." Def.'s 56.1 ¶ 25(a); Pl.'s Counter 56.1 ¶ 25.

2. On four occasions D'Antonio's subordinate, Ledesma, made errors resulting in incorrect billing, Paprota came to D'Antonio, saying "how do we stop this from happening, pacing back and forth, just being stressful, creating stress, anxiety . . . ." During the fourth such interaction (allegedly the day before D' Antonio's termination), Paprota "came in with this super type of walk, smashed his hands on the desk, [and] jumped up in [D'Antonio's] face." D'Antonio testified that he said that he and Paprota needed to have a meeting with Boschert or D'Antonio would complain to someone outside the department. Def.'s 56.1 ¶ 25(b); Pl.'s Counter 56.1 ¶ 25.

3. After Ledesma made another "big mistake," Paprota came to D'Antonio and said "[w]e have to keep this from happening in the future, how can we stop this from happening again, it's costing the company money . . . ." Def.'s 56.1 ¶ 25(c); Pl.'s Counter 56.1 ¶ 25.

4. After Paprota found D' Antonio speaking with a company official, Paprota "told me never to do that, I'm not supposed to be talking to him, he's upper management I'm not supposed to be involved with him. You have to know your place. All kinds of derogatory remarks to kind of put me down as much as possible. Create stress, anxiety . . . feel useless." D'

Antonio admitted he should not have been speaking to the person. Def.'s 56.1 ¶ 25(d); Pl.'s Counter 56.1 ¶ 25.

5.      After Paprota found D'Antonio speaking with a co-worker, Susan Burrell (whom Boschert and Paprota had previously warned about socializing at work), Paprota "came in and bomb blasted me, told me not to talk to her, she's not supposed to be talking, she's supposed to be doing her job.  Started rambling on about, you got work to do, you can't talk to people, et cetera, et cetera, et cetera."  Def.'s 56.1 ¶ 25(e); Pl.'s Counter 56.1 ¶ 25.

With respect to the July 18, 2012 interaction, D'Antonio sent an email to Paprota, copying Boschert stating in relevant part:

> In addition, you were just in my office in an out of control state.  I consider your behavior harassment.  You were loud, obnoxious, challenging and down right rude.  This will not be tolerated without follow up in the future.  I suggest we sit with Brian [Boschert] and discuss how to properly converse with employees in a civilized manner.  I am a person and should be treated as such, always.

Def.'s 56.1 ¶ 33; Pl.'s Counter 56.1 ¶ 33. Approximately one half hour later, Paprota responded with an email to D' Antonio, copying Boschert, stating:

> I was frustrated because this project has been going in since November of 2011, I differ with your explanation of "out of control."  As a matter of fact I left your office after you asked me to outline the steps to get the task completed, steps that have been verbally discussed several times on the past.  If you want to sit down with Brian that is fine, I will ask Brian to schedule.  In the meantime please initiate this task.

Def.'s 56.1 ¶ 34; Pl.'s Counter 56.1 ¶ 34. D'Antonio replied approximately fifteen minutes later with an email to Paprota, copying Boschert stating: "We need to sit and talk with Brian. I will not allow myself to be badgered.  You will not address me in that manner."  Def.'s 56.1 ¶ 35; Pl.'s

Counter 56.1 ¶ 35.

D' Antonio admits that he never made a complaint about age discrimination. Def.'s 56.1 ¶ 36; Pl.'s Counter 56.1 ¶ 36.

Meanwhile in 2012, Boschert and Paprota, as part of their compliance with DiMattio's directive, then turned their attention to IT's Operation Group to determine whether three-full-time employees, *viz*. D'Antonio, Bach and Ledesama, were necessary. They had previously explored cutting Operations Group positions, even securing a proposal to outsource the Operations Group in 2006-07. In the discussions between Boschert and Paprota, only D'Antonio's position was discussed. Ex. B to Simon Aff. at 21-22.

According to their deposition testimony, in around October 2012, Boschert and Paprota concluded that D'Antonio's position was unnecessary and should be eliminated. In the regard, over the years, Petro had automated, simplified and streamlined many of the Operations Group's functions, including fully automating some 27 business-centric processes, reducing work-time on nine other procedures to a fraction of the worktime previously required, and automating/simplifying many other monitoring, utility and backup functions. As a result, they concluded that there was simply not enough work in the Operations Group for three full-time employees. D' Antonio's position of Operations Supervisor was the more logical candidate for elimination because Bach and Ledesma, as Operations Analysts, performed the front-line work to generate the reports and results necessary to Petra's operations, whereas D'Antonio's primary responsibility was to supervise these two-front line employees and with automation advances, there was no need for a supervisory layer between Paprota and the Operations Analysts.

Around March 21, 2013, Petro sent D'Antonio an email stating in relevant part, "We

have completed a review of our staffing to determine where further staffing reductions can be made in an effort to save payroll dollars and reduce operating costs. As a result of this review, we are eliminating your position as an Operations Supevisor effective immediately." On April 9, 2013 Petro terminated D'Antonio's employment.

Petro never replaced the Operations Supervisor position. D'Antonio's responsibilities were absorbed by Paprota, Bach and Ledesma.[2]

At the time of D'Antonio's April 2013 layoff, D'Antonio was 61 years old, Boschert was 53 years old and Paprota was 52 years old. After D'Antonio's lay off, Petro employed 19 individuals in its IT Department, with an average age of 49.6 years. Fourteen of the 19 (71%) were over the age of 40. Five employees (26%) were over age 60, three of whom were older than D'Antonio. Both Bach (71 years old) and Ledesma (56) continued to be employed in the Operations Group.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See*

---

[2] Plaintiff denies that he was not replaced, relying solely upon his deposition testimony that Bach told him that "Luigi Stirpe - a helpdesk employee for Defendant who upon information and belief, is less than forty (40) years of age - was trained to do some of the work D'Antonio did for defendant and was "picking up on what [D'Antonio] did pretty good." Pl.'s Rule 56 Counterstatement at ¶ 15 (quoting Ex. A (D'Antonio Dep.) to Simon Aff. at 164:14 - 167.3). As Defendant correctly points out, such inadmissible hearsay is insufficient to raise a question of fact. The Court also notes that D'Antonio admitted at his deposition that he did not know whether or not anyone actually replaced him as Operations Manager. Ex. A (D'Antonio Dep.) to Simon Aff. at 167-68.

*Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the

respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.      Plaintiff's ADA Hostile Work Environment and Disparate Treatment Claims[3]

### A.      Legal Standard

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Claims brought pursuant to the ADA are analyzed under the three-step burden-shifting framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 411 U.S. 792, 93 S. Ct. 1817,36 L. Ed.2d 668 (1973). *See, e.g., McBride v. BIC Consumer Products Mfg. Co.,* 583 F.3d 92, 96 (2d Cir. 2009). First, a plaintiff alleging discrimination must establish a prima facie case. Where the claim is a violation of the ADA, the prima facie case requires a plaintiff to "show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*

---

[3] Plaintiff's ADA retaliation claim is discussed later in this opinion together with his retaliation claims under the ADEA and FMLA.

*v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Second, the employer must

then offer evidence of a legitimate non-discriminatory reason for the adverse action. Third, the

plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason

is a pretext for the alleged discrimination. *Cortes v. MTA New York City Transit*, 802 F.3d 226,

231 (2d Cir. 2015); *Sista,* 445 F.3d at 169.  ''[T]he ultimate burden rests with the plaintiff to

offer evidence sufficient to support a reasonable inference that prohibited [disability]

discrimination occurred.''  *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir. 2005).

Where, as here, a plaintiff's argument that there are circumstances giving rise to an inference of

discriminatory intent is the same as his argument for pretext, they may be analyzed together. *See

Crawford v. Coram Fire Dist.*, 2015 WL 10044273 (E.D.N.Y. May 4, 2015); *D'Agostino v. LA

Fitness Intern*., *LLC*, 901 F. Supp.2d 413, 422 n. 4 (E.D.N.Y. 2012); *cf. Graves v. Finch Pruyn &

Co., Inc*., 457 F.3d 181, 188 (2d Cir. 2006) (declining to resolve dispute regarding establishment

of prima facie case of age discrimination on the ground that plaintiff had not "pointed to any

record evidence to dispute [defendant's] legitimate reason (so far as the ADEA is concerned) for

the alleged adverse employment action").

### B.    Summary of Arguments

For purposes of this motion, Petro does not challenge that it is subject to the ADA, that

D'Antonio is disabled within the meaning of the ADA, or that D'Antonio was otherwise

qualified to perform the essential functions of his job with or without accommodation. Def.'s

Mem. at p. 4 n.5. Rather, Defendant maintains that given the undisputed facts neither Petro's

decision to eliminate D'Antonio's position and lay him off nor D'Antonio's treatment by Paprota

and Boschert after he became disabled in April 2012 support a reasonable inference of

discrimination. In response, Plaintiff asserts that "from the time he returned from his second medical leave until the day before he was terminated Paprota subjected [him] to a continuous and concerted hostile work environment because of his disability . . . ." Pl.'s Opp. at 10. Further, he claims there is sufficient evidence to permit a jury to find that the proffered reasons for his termination are pretextual.

### C.    The Evidence Does Not Support A Reasonable Inference of Discrimination

#### 1.    The Hostile Work Environment Claim

To prevail on a claim of hostile work environment,[4] Plaintiff must demonstrate, *inter alia,* " that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment . . . ." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (brackets in original) (quotation marks omitted). This standard is a "demanding one," *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp.2d 590, 599 (S.D.N.Y. 2002), requiring that a plaintiff establish both objective and subjective components, *to wit*, "not only that [the plaintiff] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010); *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Plaintiff must show not only that [he] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.").

"Isolated incidents typically do not rise to the level of a hostile work environment unless

---

⁴ "Courts have held that hostile work environment claims under [the] ADA . . . are evaluated under the same standards as Title VII claims." *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp.2d 590, 599 (S.D.N.Y. 2002); *see also Castro*, 24 F. Supp.3d at 261 n.23 (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)); *Monterroso v. Sullivan & Cromwll, LLP*, 591 F. Supp.2d 567, 584 (S.D.N.Y. 2008).

they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret*, 451 F.3d at 149 (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 227 (2d Cir.2004)). Rather, "[c]ourts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). "Among the factors to be considered in determining whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *Scott*, 190 F. Supp.2d at 599 (citing *Harris*, 510 U.S. at 23). "[T]he Second Circuit has made it clear that insensitive comments are not per se unlawful." *Id.* (citing *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999)). It is necessary for the plaintiff to establish a link between the actions by defendants and plaintiff's membership in a protected class. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

To the extent that Plaintiff claims that Paprota "socially isolated," "put pressure on," and scrutinized him, Pl.'s Opp. at 3, such conclusory allegations are insufficient to withstand a motion for summary judgment. *See Fox v. Costco Wholesale Corp.*, 2017 WL 888324, * 9 (Mar. 6, 2017) (to withstand a motion for summary judgment a plaintiff "must do more than present conclusory statements; he must present concrete evidence from which a reasonable [fact-finder] could return a verdict in his favor.") (internal quotation marks omitted) (alteration in original). Additionally, such actions do not support a finding that plaintiff's terms and conditions of employment were altered by a pervasive hostile atmosphere. *See, e.g., Murphy v. BeavEx, Inc.*, 544 F. Supp.2d 139, 151 (D. Conn. 2008) (finding comments directed at plaintiff-employee's job

performance did not display "discriminatory animus" and did not support an ADA hostile work environment claim). Similarly, two isolated inquiries whether Plaintiff was going to retire and/or whether he could do his job do not support his hostile work environment claim. *Cf. Hong Yin v. North Shore LIJ Health System*, 20 F. Supp.3d 359, 370-71 (E.D.N.Y. 2014) (finding three incidents of arguably negative comments to be to be too isolated and minor to warrant relief under a hostile work environment theory); *Forgione v. City of N.Y.*, 2012 WL 4049832, at *7 (E.D.N.Y. Sept. 13, 2012) (dismissing hostile work environment claim where defendant "made several offensive quips to [plaintiff] about his perceived disability and told [plaintiff] he needed to see a psychiatrist").

Nor are the encounters between D'Antonio and Paprota that D'Antonio relies upon sufficient to support his hostile work environment claim. These encounters are (1) the July 2012 exchange that occurred when D'Antonio disagreed with Paprota about a project and Paprota "came flying" in D'Antonio's office, "out of control" and "smashed his hands" on the desk, cursing, and "out of control;" (2) the incidents where Paprota found him speaking (a) to a company official and chastised him that he should not be speaking with upper management, should know his place, and made "derogatory remarks" and (b) to another employee and told him not to talk with her; and (3) the exchanges resulting from Ledesma having made errors resulting in incorrect billing including that of April 2013 in which Paprota "came in with this super type of walk, smashed his hands on the desk, [and] jumped in [D'Antonio's] face." (Pl.'s Opp. at 3-5; Ex. A to Simon Aff. at 121-22, 135-45; 156).

First, there is nothing in these incidents that even suggests they are tied to plaintiff's

protected status, viz. disability.[5] *See Gregory v. Daly*, 243 F.3d 687, 694 (2d Cir. 2001) (there

must be "factual circumstances that permit the inference that plaintiff was subjected to a hostile

work environment because of his [protected status]"); *Rissman v. Chertoff*, 2008 WL 5191394 at

*4 (S.D.N.Y. Dec. 12, 2008) ("[i]n essence, plaintiff alleges that because he was yelled at [by his

supervisors], this must have been because [of his protected status]. Such conclusory and

speculative statements are insufficient [to support a hostile work environment claim]"). Second,

these incidents are not sufficiently severe or pervasive to permit a finder of fact to conclude that

Plaintiff was subject to a hostile work environment. *Marshall v. New York City Bd. of Elections*,

322 Fed. App'x 17, 18-19 (2d Cir. 2009) (allegations that plaintiff's supervisor "displayed a

violent temper, stood over her with clenched fists on several occasions, disparaged her

educational background, and engaged in crass behavior" while "troubling" do not support a claim

for hostile work environment as discrimination laws are "not a general civility code for the

American workplace; it prohibits only harassment that is discriminatory.") (internal quotation

marks omitted); *Edwards v. New York State Unified Court System*, 2012 WL 6101984 at *5

(S.D.N.Y. Nov. 20, 2012) (dismissing hostile work environment claim, because plaintiff's

allegations that her supervisors "told her to work all day, yelled at her, and closely monitored

her" describe conduct that is insufficiently severe or pervasive to state a claim).

      Having examined the record as a whole, no rational fact-finder could find that the

conditions of D'Antonio's working environment were altered by a workplace severely

"permeated with discriminatory intimidation, ridicule, and insult." *LaBella v. New York City*

---

[5] Indeed, D'Antonio admits that Paprota never made any comments about his disability.
Ex. A to Simon Aff. at 176. Instead, he simply speculates that "it was not like that until I became
disabled . . . . There was no reason for it except the fact that I was disabled . . . ." *Id*. at 175-76.

*Admin. for Children's Servs.*, 2005 WL 2077192, at *19 (E.D.N.Y. Mar. 28, 2005). Summary judgment is granted against Plaintiff on his ADA hostile work environment claim.[6]

## 2.   The Disparate Treatment Claim

Plaintiff's disparate treatment claim is grounded in the elimination of his position and subsequent termination. Preliminarily, the Court notes that Plaintiff makes no argument that he established a prima facie case as to this claim. *See* Pl.'s Opp. at 10-11.[7] Rather he argues that Petro's alleged non-discriminatory reasons for eliminating his position and terminating him were pretextual because (1) only he was considered for termination; (2) the conversations about terminating him occurred in 2012, "arguably" after he became disabled; (3) Paprota's "hostile" behavior was only directed at him; (4) Boschert never held a meeting to deal with D'Antonio's email complaint about Paprota's behavior. Pl.'s Opp. at 12.

Petro's proffered reasons for eliminating the position of Operations Manager and terminating D'Antonio are that it was part of an effort to reduce costs. It is undisputed that Boschert's supervisor directed him prior to 2012 to reduce IT expenditure and, if possible, trim staff.  It is undisputed that in response and prior to D'Antonio's termination Boschert eliminated the position of Networking Supervisor, reduced two positions from full-time to part-time and did not fill an open position. It is undisputed that IT included Operations Group in which D'Antonio worked, and that the Operations consisted only of D'Antonio, Bach and Ledesma. It is

---

[6] The Court notes parenthetically that it is hard pressed to find an ADA hostile work environment claim in the complaint.

[7] Although there is a heading entitled "Plaintiff has established a *Prima Facie* case of Disability and Age Discrimination under the ADA/ADEA/NYSHRL" that section contains only an argument that he was terminated under circumstances giving rise to an inference of age discrimination.

undisputed that D'Antonio was not replaced. Petro also submitted evidence that it had "automated, simplified, and streamlined many of the Operations Group's functions, including fully automating some 27 business centric processes, reducing work time on nine other procedures to a fraction of the time previously required, and automating/simplifying many other monitoring, utility and backup functions." Def.'s Mem at 8 (citing Ex. D to Simon Aff.; Ex. B to Simon Aff. at 24; Ex. C to Simon Aff. at 20, 29-32). Because D'Antonio's primary responsibility was to supervise Bach and Ledesma, with automation advances, Petro points out that "there was no need for a supervisory layer between Paprota (Operations and Systems Manager) and the Operations Analysts (Bach and Ledesma)" and that "eliminati[on] of D'Antonio's position would have the least impact on the Operations Groups, the IT Department and Petro's operations generally." *Id*. at 9.

Against this backdrop, plaintiff has failed to put forth sufficient evidence to permit a reasonable trier of fact to find that the proffered reason is a pretext. As the Operations Group consisted of only three individuals with D'Antonio in a supervisory position, that D'Antonio's position was the only one discussed for elimination does not support pretext. Nor does the timing of the discussions support an inference of pretext given that reductions in the IT Department, of which the Operations Group was a part, had begun prior to the onset of D'Antonio's alleged disability. With respect to Paprota's behavior, as discussed earlier there is nothing that tethers this behavior to Plaintiff's disability. Additionally, any failure of Boschert to address Paprota's behavior is, at worst, a failure to properly manage and does not support the claim of pretext. In sum, Plaintiff has failed to offer evidence sufficient to support a reasonable inference that the elimination of his position and resultant termination occurred because of prohibited disability

discrimination. *See generally, Chapman v. Sikorsky Aircraft Corp.*, 2015 WL 7783523 (D. Conn. Dec. 3, 2015) ("[T]o prove pretext, an age discrimination plaintiff must do more than simply refute or cast doubt, on the employer's rationale. The rule that proof of pretext also requires proof that discrimination was the real reason for an adverse job action has long been settled in the Second Circuit.") (internal quotation marks and internal citations omitted).

Summary judgment is granted in favor of Defendant and against Plaintiff on his ADA claims.

## III.    Plaintiff's ADEA Claim

### A.    Legal Standard

The ADEA prohibits workplace discrimination on the basis of age. *See* 29 U.S.C. §§ 621(b), 623(a). Like ADA claims, ADEA claims are analyzed under the *McDonnell Douglas* burden-shifting framework, *viz.* a plaintiff must first establish a prima facie case of age discrimination, after which the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions, and if the employer articulates such a reason, the plaintiff then has the burden of proving that his age was the real reason for his discharge. *See, e.g., Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). In order to withstand summary judgment, a plaintiff claiming a violation under the ADEA must raise a triable issue that age was the "but for" reason for the adverse employment action. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168-69 (2d Cir. 2014) (A plaintiff must "present[ ] facts, which taken in his favor, suffice to show that a triable issue exists as to whether his age was a 'but for' cause of his termination," i.e., that "the adverse employment action would not have occurred without it." )

**B.    The Evidence Does Not Support an Age Discrimination Claim**

To support his claim of age discrimination, D'Antonio asserts that he has met his burden of establishing a prima facie case because he was replaced by someone outside his protected class. He further asserts that the fact he was replaced, together with Paprota's inquiries about his retirement, is sufficient to defeat the motion for summary judgment on his age discrimination claims. Pl.'s Opp. at 11. It is not.

Turning first to his allegedly being replaced, D'Antonio has failed to submit any admissible evidence that he was replaced by anyone, no less someone under the age of 40. He relies upon his deposition testimony wherein he recounted that "he [D'Antonio"] was informed by Joseph Back [sic] that Luigi Stirpe had taken over his responsibilities," Pl.'s Opp. at 11.[8] Bach's out of court statement, offered for its truth is inadmissible hearsay, *see* Fed. R. Evid. 801, and therefor insufficient to defeat Defendant's motion.

Moreover, as Petro points out, there is an abundance of evidence that suggests that the elimination of D'Antonio's position and his resultant termination were not the result of age discrimination. Def.'s Mem. at 17-18. This evidence includes that both Boschert and Paprota were both over 40 i.e., 53 and 52 respectively, and relatively close to D'Antonio's age (61), as well as the fact that D'Antonio was not replaced. *See Zuffante v. Elderplan, Inc.*, 2004 WL 744858, *7 (S.D.N.Y. Mar. 31, 2004). It also includes the demographics of the IT department: "after D'Antonio's lay off, Petro employed 19 individuals in the IT Department, with an average age of 49.6 years. Fourteen of the 19 (71%) were over the age of 40. Five employees (26%) were

---

[8] Indeed, D'Antonio admitted at his deposition that he has "no idea" whether he was actually replaced by a younger worker. Ex. A (D'Antonio Dep.) to Simon Aff. at 167-68, 178.

over the age of 60, three of whom were older than D'Antonio. [And] Petro continued to employ both Bach (71 years old) and Ledesma (56)." Def.'s Mem. at 18 (citing Simon Ex. G.) *See Carr v. Westlb Admin., Inc.*, 171 F. Supp.2d 302, 308 (S.D.N.Y. 2001) (granting summary judgment on claim that job termination was due to age discrimination where there "was uncontroverted evidence that almost half of plaintiff's former coworkers are over the age of forty and that plaintiff was younger than at least two other employees in his department and only one year older than a third").

Additionally, that Paprota twice asked D'Antonio about retirement is insufficient to satisfy Plaintiff's ultimate burden of persuading the trier of fact that Petro intentionally discriminated against him. An inference of discriminatory motive may be drawn from " remarks made by decision-makers that could be viewed as reflecting a discriminatory animus . . . . " *Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001) (internal quotation marks omitted). "The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Vogel v. CA* Inc., 662 Fed. App'x 72, 75 (2d Cir. 2016) (internal quotation marks omitted).

Given the undisputed facts set forth above regarding the ages of the decision-makers in this case, viz. Boschert and Paprota, and the demographics of the IT department, together with the fact that Paprota immediately dropped the matter when D'Antonio responded that he was not considering retirement, and the absence of any indicia of improper animus, the two inquiries are insufficient to raise an inference of discrimination. *See Hamilton v. Mount Sinai Hosp.*, 528 F. Supp2d 431, 447-48 (S.D.N.Y. 2007) (stating "discussion of retirement is common in offices, even between supervisors and employees, and is typically unrelated to age discrimination").

**IV.    Plaintiff's Retaliation Claims**

**A.    Legal Standard**

The ADA, ADEA, and FMLA prohibit retaliation against employees who engage in protected protected. *See Palummo v. St. Vincent's Med. Ctr.*, 4 Fed. App'x 99, 102 (2d Cir. 2001 (ADA and ADEA); *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004) (FMLA). Such retaliation claims are analyzed using the *McDonnell Douglas* "burden-shifting" formula. *See, e.g., Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). To make out a prima facie case of retaliation, plaintiff must establish "evidence sufficient to permit a rational trier of fact to find (1) that []he engaged in protected participation or opposition under [the relevant statute], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Id.* at 205–06 (citation omitted).

**B.    Retaliation under the ADEA, FMLA and ADA**

**1.    ADEA and FMLA Retaliation**

The first element of a retaliation claim is that the plaintiff engaged in protected activity. D'Antonio maintains that his protected activity was  the following portion of his July 12, 2012 email to Paprota, copied to Boschert:

> In addition, you were just in my office in an out of control state. I consider your behavior harassment. You were loud, obnoxious, challenging and down right rude. This will not be tolerated without follow up in the future. I suggest we sit down with Brian and discuss how to properly converse with employees in a civilized

manner. I am a person and should be treated as such, always.

Ex. F to Simon Aff.

Protected activity for purposes of the ADA and the ADEA include "informal protests of discriminatory employment practices, including making complaints to management." *DeVore v. Neighborhood Housing Servs. of Jamaica, Inc.*, 2017 WL 1034787, *9 (E.D.N.Y. Mar. 16, 2017) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 317-18 (2d Cir. 2015)). Generalized complaints, however, are insufficient; complaints must be sufficiently specific to make clear that the employee is complaining about conduct prohibited by the applicable discrimination statute. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011). "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp.2d 166, 191 (E.D.N.Y. 2011) (citing, inter alia, *Velasquez v. Goldwater Memorial Hosp.*, 88 F. Supp.2d 257, 264 (S.D.N.Y. 2000) (general complaints about corporate policy without linking it to plaintiff's status are insufficient to establish "protected activity" under Title VII).

D'Antonio's email simply does not complain about disability or FMLA discrimination. It is no more than a complaint about civility and as such is insufficient to constitute protected activity. As D'Antonio has not put forth evidence that he engaged in protected activity, summary judgment is granted in favor of Petro on the ADEA and FMLA retaliation claim.[9]

---

[9] With respect to the FMLA claim, the Court also notes that the time between D'Antonio's FMLA leave and his layoff is too attenuated to support causation, *see, e.g., DeVore,*

2. <u>ADA Retaliation</u>

There is no evidence in this record that D'Antonio engage in protected activity vis a vis his age discrimination claim. Indeed, D'Antonio conceded that he never made a complaint about age discrimination, Ex. A to Simon Aff. at 179, and therefore summary judgment is appropriately granted to Defendant on the ADA retaliation claim.[10]

## V. **Plaintiff's NYSHRL Claims**

"It is well-settled that the elements of an employment discrimination claim are essentially the same under the NYSHRL and its federal counterparts." *Knox v. Town of Southeast*, 2014 WL 1285654, at *14, n.20 (S.D.N.Y. Mar. 31, 2014) (citing *Tyler v. Bethlehem Steel Corp*., 958 F.2d 1176, 1180 (2d Cir.1992)); *accord Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp.2d 392, 409 (S.D.N.Y. 2012). Similarly, NYSHRL retaliation claims are analyzed under the same framework as their federal counterparts. *Apionishev v. Columbia Univ. in City of N.Y.*, 2012 WL 208998, at *7 (S.D.N.Y. Jan. 23, 2012). Accordingly, summary judgment is granted in favor of Petro on all of Plaintiff's NYSHRL claims.

---

2017 WL 1034787, *11 (nothing "time spans even shorted than seven month have frequently been held too attentuated to support an inference of causation") (citing cases), and that Petro himself took FMLA leave undermines this claim, *see Browne v. CNN America, Inc.*, 1999 WL 1084236 (S.D.N.Y. Dec. 1, 1999) (that decision maker was a member of protected enhances the inference that discrimination was *not* the motive), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) (summary order).

[10] As D'Antonio did not oppose Petro's motion for summary judgment on his ADA retaliation claim, that claim is also appropriately dismissed as abandoned.

**CONCLUSION**

For the reasons set forth above, Petro's motion for summary judgment is granted on all of Plaintiff's claims. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      March 29, 2017                     /s/  Denis R. Hurley
                                         Denis R. Hurley
                                         United States District Judge